SO ORDERED.

SIGNED this 19 day of July, 2018.



_____
Joseph N. Callaway
United States Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| STILETTO MANUFACTURING, INC. | 18-01051-5-JNC |
| | CHAPTER 11 |
| DEBTOR | |

MEMORANDUM OPINION REGARDING MOTION
FOR RELIEF FROM AUTOMATIC STAY

At a hearing conducted on July 2, 2018, in Greenville, North Carolina, the court considered the Motion for Relief from Automatic Stay filed in this case by Mr. John Enderle on May 29, 2018 (D.E. 85; the "Motion"), together with the Response in Opposition to John Enderle's Motion for Relief from Automatic Stay filed by CapitalNexus, LLC ("CN") on June 11, 2018 (D.E. 100; the "Response"). The hearing was attended by counsel for the debtor, counsel for CN, the Bankruptcy Administrator, Mr. Enderle, and his counsel.[1] Upon its conclusion, the court found that the automatic stay of 11 U.S.C. § 362 did not apply, as the underlying sale was occurring in the ordinary course of business of the Debtor. The court issued a cursory order to that effect on July

---

[1] The Bankruptcy Administrator also filed a response opposing the relief sought in the Motion (D.E. 101), but withdrew that response prior to the hearing (D.E. 117).

3, 2018 (D.E. 121; the "Order").[2] This memorandum opinion provides a more detailed discussion of the findings of fact and conclusions of law supporting the Order.

## FACTUAL BACKGROUND

Stiletto Manufacturing, Inc. (the "Debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on March 2, 2018 (the "Petition Date"). The Debtor filed its schedules on March 23, 2018 (D.E. 26), which indicated that both CN and Mr. Enderle were shareholders.[3] The schedules also identified an executory contract with Mr. Enderle, although the subject of the contract was not disclosed. *See* D.E. 26 at 24, 44. The Debtor is in the business of manufacturing and selling custom catamaran boats from its business location in Columbia, North Carolina. According to its Schedule G, at the time of filing the Debtor had at least nine (9) pending contracts with various buyers for the purchase of custom made boats, and construction had commenced on four (4) boats. *See id.* at 23–25. One of those prepetition contracts upon which work had begun was the "Stiletto X-Series Yacht Construction Agreement" entered August 3, 2017 by Mr. Enderle and the Debtor (the "Original Agreement").

Pursuant to its terms, the Debtor was to manufacture a custom catamaran in its XC model line with a length of thirty (30) feet, a beam of eighteen (18) feet, and a displacement of 1,750 pounds (the "Boat"). Mr. Enderle was to pay the contract price for the Boat with a deposit and subsequent periodic progress payments. On April 27, 2018, Mr. Enderle and the Debtor modified

---

[2] The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 151, 157 and 1334, and the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

[3] Mr. Enderle is stated to own 0.09% of the preferred stock of the Debtor. D.E. 26 at 44. CN's ownership percentage is not listed in the Debtor's schedules and appears to be disputed. CN asserts that it is owed about $3.3 million in unsecured debt by the Debtor, and that it contributed around $800,000 in equity. *See* Claim 16-1. The Debtor has not conceded either of these claims. The court makes no finding as to the scope or nature of CN's claims or ownership interest other than finding it has standing to oppose the Motion.

2

the Original Agreement in writing (the "Modified Agreement"). According to the testimony of Mr. Enderle, among other things the Modified Agreement removed some of the custom construction options he had previously selected, the most important alteration being the substitution of the required boom and longeron materials from carbon fiber to aluminum. This change resulted in a significant price reduction and earlier anticipated completion date.

Pursuant to the Modified Agreement, Mr. Enderle was to pay a total of $124,772.00 (the "Purchase Price") for the Boat, plus taxes, registration, and documentation fees. The Boat was to be completed and Mr. Enderle was to take delivery on June 15, 2018. Mr. Enderle paid a deposit, bought some building materials outright from third party suppliers for contract credit, and made the necessary periodic progress payments to the Debtor. By the time he was to take possession of the Boat on June 15, 2018, Mr. Enderle had paid the full amount of the Purchase Price to the Debtor. He visited the Debtor's facility at least four times during the construction period. At his most recent visit, a week or two prior to the hearing, he observed that the Boat was nearly completed, with the balance of the work being only the attachment of a finished cockpit to the hulls, along with rigging and associated hardware. Notwithstanding the need to complete these relatively minor final items, when the Motion was filed, the Boat was at a stage in the construction process where upon final payment a certificate of origin could be produced by the Debtor as the manufacturer, and Mr. Enderle as the buyer was entitled to apply for and receive the initial maritime certificate of title issuable by the United States Coast Guard.

## POSITIONS OF THE PARTIES

Mr. Enderle argues that the Modified Agreement was executed and performed in the ordinary course of the Debtor's business. Therefore, pursuant to 11 U.S.C. § 363(c)(1), no prior court approval for the execution and performance of it was necessary. Notwithstanding that the

performance of the Modified Agreement is authorized by § 363(c), he also seeks relief from the automatic stay of § 362(a) in order to finalize the sale and transfer of the Boat, and avoid any risk of violating the automatic stay. In essence, he seeks a "comfort order."

In the Response, CN argues that Mr. Enderle is not entitled to receive possession and transfer of the boat because the Modified Agreement is an executory contract that has neither been assumed nor rejected by the Debtor. CN contends that it is in the best interest of the bankruptcy estate for the Debtor to reject the Modified Agreement as an executory contract. In support, it relies upon many of the same points expounded in its pending Motion to Convert Case to One Under Chapter 7 (D.E. 94; the "Motion to Convert"), which is set for hearing on July 18, 2018. CN asserts that the Debtor is no longer operating, that the Boat is unfinished, and that "as early as May 9, 2018, the Debtor indicated to the Court and creditors of the Estate that it would file a Motion pursuant to section 363 to sell all assets of the Estate." Response, D.E. 100 at 2, ¶ 6. Allowing Mr. Enderle to receive title to the Boat, CN maintains, is tantamount to an end run of the Bankruptcy Code's priority scheme by effectively satisfying Mr. Enderle's unsecured claim in full with resultant diminution of estate assets in the event of future liquidation.

## DISCUSSION

The lynchpin of this dispute is whether the Original Agreement was brought into the estate as part of the debtor's ordinary business and then whether the Debtor could execute and be bound by the Modified Agreement without prior court approval. This inquiry is complicated somewhat by the fact that the Modified Agreement applied to an agreement initially entered prepetition. There is no dispute that the Original Agreement was executory on the Petition Date. The initial query thus becomes whether a chapter 11 debtor in possession may, together with the non-debtor party to an executory contract, rescind an executory contract post-petition without court approval

4

if the sales contract (and thus presumably its rescission) is an activity otherwise within the ordinary course of the debtor's business. For the reasons that follow, the court concludes that it can.

### I.  The Effect of the Modified Agreement on the Original Agreement—§ 365(a)

Section 365 of the Bankruptcy Code governs rejection or assumption of executory contracts and unexpired leases. 11 U.S.C. § 365(a). Either course of action requires court approval. *Id.* Where an executory contract is assumed, the assumption must specifically be sought in a motion; executory contracts cannot be implicitly assumed or assumed by conduct. *See, e.g. In re A.H. Robins Co., Inc.*, 68 B.R. 705, 711 (Bankr. E.D. Va. 1986) ("Continuing to receive benefits and electing to assume an executory contract are two wholly different matters.").

However, courts have recognized that section 365 does not prescribe every permissible outcome regarding an executory contract; it merely governs acceptance or rejection. For example, section 365 has no effect on an executory contract that, by its own terms, expires before the court has approved its assumption or rejection by the trustee or debtor in possession. *See, e.g.*, *Gloria Mfg. Corp. v. Int'l Ladies Garment Workers Union*, 734 F.2d 1020, 1022 (4th Cir. 1984) (citing 2 *Collier on Bankruptcy* ¶ 365.02 (15th ed. 1983)) ("Once a contract has expired on its own terms, there is nothing left for the trustee to reject or assume.").

Similarly, courts have held that where the debtor in possession and the non-debtor party to an executory contract mutually and voluntarily modify an executory contract, such modification does not require court approval under § 365(a) if the debtor in possession continued to operate and the contract was procured, modified, and performed in the course of the debtor in possession's ordinary business. *See Biggs, Inc. v. Glosser Bros., Inc. (In re Glosser Bros.),* 124 B.R. 664 (Bankr. W.D. Penn. 1991). In *Biggs*, the debtor in possession, Glosser Brothers, Inc. ("Glosser"), owned and operated a chain of retail and discount department stores and warehouse outlets. Glosser

5

contracted with Biggs, Inc. ("Biggs") to enter a licensing agreement allowing Biggs to sell its toys and sporting goods in some of Glosser's stores. *Id.* at 664–65. The agreement was set to expire on January 31, 1988, but would be automatically renewed for an additional year unless either party opted out in writing served 120 days prior to expiration. *Id.* at 665. Neither party timely opted out, so under the terms a new termination date of January 31, 1989 was imposed. *Id.* at 665.

On March 24, 1989, Glosser filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. *Id.* Five months later, and before the extended agreement would automatically expire, Glosser and Biggs executed a modified licensing agreement that provided Biggs would continue to sell toys in Glosser's stores through the holiday season. The amended license would terminate on January 27, 1990, four (4) days earlier than the original agreement termination date. *Id.* Glosser neither sought nor obtained court approval of the post-petition agreement modification. On January 9, 1990, Glosser filed a proposed plan of reorganization providing that all executory contracts not expressly assumed would be rejected. *Id.* The plan was confirmed shortly thereafter. *Id.* Following confirmation, Biggs filed a proof of claim for $300,000 for damages it claimed were suffered as a result of Glosser's rejection of the original agreement. *Id.* Glosser objected to Biggs' claim, asserting that it owed Biggs nothing as there was no agreement rejected by the confirmed plan. *Id.*

Biggs argued to the bankruptcy court that § 365(a) was the exclusive means by which an executory contract could be rejected, that the subsequent agreement was a legal nullity because it was not approved by the court, and that the original agreement remained in effect until it was rejected by the confirmed plan. *Id.* Glosser countered that § 365(a) did not apply because the subsequent agreement was not a "rejection" of the original agreement, but simply a mutual modification establishing a new termination date for the license. Further, Glosser argued, the

6

modified agreement was entered as part of its ordinary course of business, and as such, pursuant to § 363(c), court approval of assumption or rejection was not required. Therefore, Biggs' license terminated pursuant to the contractual terms on January 27, 1989. The agreement did not exist as of the effective date of the plan. As a result, no agreement existed to reject via the plan.

The court agreed with Glosser and sustained its objection to Biggs' rejection claim, holding that § 365(a) did not control the legal efficacy of the subsequent agreement because it was not a rejection of the original agreement. Among the distinctions made by the court was that:

> The subsequent agreement was not unilateral action taken by debtor and imposed upon [Biggs]. Rather, it was mutually agreed to by debtor and Biggs. The term "rejection", in common parlance, seems to involve a unilateral decision by one party which is not mutually acceptable to another party. There is nothing to indicate that the concept of rejection, as it applies to 11 U.S.C. § 365(a), is different in this regard or that the subsequent agreement was unacceptable to Biggs. Clearly it was not imposed upon Biggs as it was put to paper at their instigation and served as a comfort to them.

*Id.* at 666–67.

Significantly, the court differentiated the unilateral rejection under § 365 from a mutual modification or rescission of an executory contract voluntarily made between the debtor and the non-debtor counterparty. The court concluded that the entering into and modification of licensing agreements with retailers who sold items in its stores was in Glosser's ordinary course of business, and that the subsequent agreement was therefore legally effective notwithstanding the lack of court approval, pursuant to § 363(c).

*Biggs* recognizes that a debtor and a non-debtor party to an executory contract may modify or rescind an executory contract without prior court approval if the contract exists within the debtor's ordinary course of business and the post-petition alteration is also within that scope. The result is consistent with the policy goals behind § 365: to afford latitude and breathing room to

7

debtors in order to assess whether the benefits and burdens of a particular contract or lease will be beneficial or cumbersome to it, while in the meantime protecting the due process and property rights of the non-debtor counterparty.[4]

The one-sidedness of the arrangement for executory contracts has been recognized by the Supreme Court in the context of collective bargaining agreements: "[F]rom the filing of a petition in bankruptcy until formal acceptance, [a] collective-bargaining agreement is not an enforceable contract . . . ." *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 532 (1984). Similarly, "the filing of the petition in bankruptcy means that the collective-bargaining agreement is no longer immediately enforceable, and may never be enforceable again." *Id.* Simply put, whether the terms of an executory contract will bind the debtor in bankruptcy is a unilateral decision in the hands of the debtor, and the non-debtor party is largely a bystander pending that determination.

However, when the debtor and the non-debtor party voluntarily modify or rescind an executory contract, the debtor is no longer wielding the coercive powers afforded under § 365. Consequently, the justification for many of the safeguards and requirements for acceptance or rejection of an executory contract are largely absent. If the modification or rescission is outside the debtor's ordinary course of business, such action must be approved by the bankruptcy court pursuant to § 363(b), which would require a finding that the modification or rescission was a sound exercise of the debtor's business judgment. *See, e.g.*, *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d

---

[4] The Bankruptcy Code thus affords debtors an extraordinary set of rights with respect to executory contracts that are asymmetrical compared to those of the non-debtor party:

> [D]uring the period from the date of filing until the date on which the [debtor in possession] rejects or assumes an executory contract, the non-debtor party is bound to perform while the [debtor in possession] temporarily is not bound to perform.

Douglas W. Bordewieck, *The Postpetition, Pre-Rejection, Pre-Assumption Status of an Executory Contract*, 59 Am. Bankr. L.J. 197, 200 (1985).

Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."). Significantly, this is the exact same standard a court would apply when evaluating a debtor's request to accept or reject an executory contract. *See, e.g.*, *In re FCX, Inc.*, 60 B.R. 405, 411 (E.D.N.C. 1986) ("[T]he debtor must have a good business judgment reason for asking the Bankruptcy Court to permit it to assume the executory contract."). However, where the debtor and the non-debtor counterparty mutually rescind or modify an executory contract within the parameters of the debtor's ordinary course of business, no prior notice to creditors or court approval is required. *See, e.g., Glosser Bros.*, 124 B.R. at 668 (emphasis in original) ("[I]t must be concluded that the subsequent agreement executed on September 7, 1989 occurred in the ordinary course of debtor's business. It therefore follows, pursuant to 11 U.S.C. § 363(c)(1), that court approval was *not* required in order for the agreement to have legal effect.").

Here, the Modified Agreement expressly states that it "supersedes and replaces the original agreement signed by the parties in [*sic*] 3 August, 2017." Pl.'s Ex. A at 1. Thus, if the Original Agreement and the Modified Agreement were both of the type that the Debtor would enter into in the ordinary course of its business, then the Debtor and Mr. Enderle were together empowered to rescind the Original Agreement, through the Modified Agreement, post-petition and without first seeking court approval pursuant to § 363(c)(1). The next inquiry therefore is whether the Original Agreement and Modified Agreement were in the Debtor's ordinary course of business.

## II.   The Characterization of the Modified Agreement—§ 363(c)

A debtor in possession is empowered to exercise nearly all of the rights of a trustee in a voluntary case proceeding under chapter 11 of the Bankruptcy Code. 11 U.S.C. § 1107(a). Those rights include, unless the court orders otherwise, the power to operate the debtor's business. 11

U.S.C. § 1108. In so operating its business, a debtor in possession may, unless the court orders otherwise, "enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing . . . ." 11 U.S.C. § 363(c)(1).

On the other hand, the debtor in possession may only enter into transactions outside the ordinary course of its business after notice and a hearing. 11 U.S.C. § 363(b)(1). This dichotomy is designed to allow the debtor in possession to continue to operate its business post-petition while protecting the reasonable expectations of creditors and other parties in interest:

> [T]he apparent purpose of requiring notice only where the use of property is extraordinary is to assure interested persons of an opportunity to be heard concerning transactions different from those that might be expected to take place so long as the debtor in possession is allowed to continue normal business operations under 11 U.S.C. § 1107(a) & § 1108. The touchstone of "ordinariness" is thus the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business. So long as the transactions conducted are consistent with these expectations, creditors have no right to notice and hearing, because their objections to such transactions are likely to relate to the bankrupt's chapter 11 status, not the particular transactions themselves.

*Johnston v. First St. Cos. (In re Waterfront Cos., Inc.)*, 56 B.R. 31, 35 (Bankr. D. Minn. 1985) (quoting *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 394 (Bankr. S.D.N.Y. 1983)).

In focusing on the reasonable expectations of the debtor's creditors and other interested parties, courts have evolved "a two-step inquiry for determining whether a transaction is in 'the ordinary course of business': a 'horizontal dimension' test and a 'vertical dimension' test." *In re Roth Am., Inc.*, 975 F.2d 949, 953 (3d Cir. 1992) (citing Benjamin Weintraub & Alan N. Resnick, *The Meaning of 'Ordinary Course of Business' under the Bankruptcy Code—Vertical and Horizontal Analysis*, 19 UCC L.J. 364, 365 (1987)). *See also Devan v. Phoenix Am. Life Ins. Co. (In re Merry-Go-Round Enters., Inc.)*, 400 F.3d 219, 226 (4th Cir. 2005) (applying the horizontal

and vertical dimensions test when analyzing whether a transaction was in the ordinary course of the debtor's business).

The horizontal dimension test asks "whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry." *Roth Am.*, 975 F.2d at 953 (citing Weintraub & Resnick, *Ordinary Course of Business*, *supra*, at 367). For example, "raising a crop would not be in the ordinary course of business for a widget manufacturer because that is not a widget manufacturer's ordinary business." *Waterfront Cos.*, 56 B.R. at 35.

The vertical dimension test, also referred to as the "creditor's expectation test," asks "whether the transaction subjects a creditor to economic risk of a nature different from those he accepted when he decided to extend credit." *Roth Am.*, 975 F.2d at 953 (quoting Weintraub & Resnick, *Ordinary Course of Business*, *supra*, at 365). Thus, while the focus of the horizontal dimension test is other similarly-situated businesses in the debtor's industry, the vertical dimension test focuses on the debtor's specific business practices and the reasonable expectations of creditors based thereon. In evaluating the "ordinariness" of a debtor's activities, the court should therefore consider "the nature, type and size of its business." *Comm. Of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 617 (Bankr. S.D.N.Y. 1986). Finally, while the debtor's "prepetition activities guide the court in ascertaining whether a transaction is in the ordinary course," such prepetition activities are not dispositive of the inquiry, as "changes between prepetition and postpetition business activity alone are not *per se* evidence of extraordinariness." *Id.*

Here, it is undisputed that the Debtor is currently a debtor in possession and is authorized to operate its business pursuant to 11 U.S.C. §§ 1107 and 1108. It is further not subject to reasonable dispute that the Debtor prepetition was and post-petition continues to be "engaged in

11

the development and production of Stiletto catamaran sailboats."[5] The Debtor does not mass-manufacture such boats, nor does it sell them from a showroom or to independent retailers. Rather, each catamaran is custom-made by the Debtor pursuant to an individual production contract negotiated and executed between the Debtor and a prospective buyer.[6] The Debtor began manufacturing and selling a customizable model catamaran in March 2015, which is when it was incorporated. Eighteen months later, it had outfitted a production facility, constructed molds and tools for production, and constructed a prototype model catamaran, which it took to the Annapolis boat show in October 2017 to market to potential buyers.[7] On the Petition Date, the Debtor was in the process constructing at least four (4) separate catamaran sailboats for various customers pursuant to executed production contracts.[8] Also as disclosed in its schedules, the Debtor had at least nine (9) pending contracts with buyers for the production of Stiletto sailboats on the Petition Date, including the Original Agreement with Mr. Enderle. D.E. 26 at 23–24.

Boat manufacturing companies sell boats at the retail and wholesale levels. Companies selling high-end custom-made boats, like the Debtor, typically sell to end-use retail customers under a production contract that incorporates the plans and details of the customized product. CN has made no argument and offered no evidence that the Original and Modified Agreements were unusual in any respect in the context of the custom boat building industry, or otherwise were not the type of contracts executed with respect to such transactions as typically undertaken by others in the custom boat-building industry.

---

[5] In fact, CN signed a consent order reciting precisely such a finding earlier in this case. D.E. 74 at 1.
[6] Test. of Jay M. Phillips, CEO of Debtor, March 27, 2018 Hr'g Audio (D.E. 29) at 00:18:10 – 00:18:20.
[7] *Id.* at 00:15:00 – 00:16:30.
[8] *Id.* at 00:16:45 – 00:18:10.

Therefore, the execution of the Original Agreement and the rescission of that agreement and execution of the Modified Agreement both meet the horizontal dimension test. In fact, the evidence presented at the hearing illustrated that although the Modified Agreement purported to rescind the Original Agreement, in reality it was nothing more than a change order that replaced some of the more expensive and difficult-to-obtain parts for less expensive and more readily-available parts. Contract adjustments of price and delivery date are not remarkable or extraordinary in the industry. Nothing about the Modified Agreement deviates from expected regular and ordinary custom boat building business operations.

Seemingly acknowledging that there was nothing extraordinary about the Original Agreement or Modified Agreement in the abstract, CN focused its argument on the vertical dimension and creditor's expectations test. Its chief argument is that *this* Debtor has no ordinary course of business because allegedly it has never fully completed a boat,[9] has not demonstrated that it can build boats profitably, and that the Modified Agreement is an executory contract that should be rejected as not in the best interests of the Debtor. First, the Debtor has been in business for less than four years, and did not solicit custom boat contracts until 2017 when it took a prototype to the Annapolis boat show. Whether the Debtor has completed a boat prepetition is not particularly persuasive in this situation, where, with four (4) boats under construction on the Petition Date and orders for five (5) more pending, the Debtor's problem is not a lack of work. Rather, obviously, it needs capital to perform work. Also, the completion (defined as deliverable

---

[9] No evidence was presented by CN on this or any other point. Its cross-examination of Mr. Enderle did not burn through the fog to yield any testimony materially supporting its contentions.

in a title issuance state) of Mr. Enderle's Boat demonstrates an ability to meet that demand and produce a product if properly funded.[10]

Next, whether or not the Modified Agreement specifically, or ongoing operations generally, will be profitable for the Debtor is simply irrelevant to the creditor's expectation analysis. Creditors (or investors) such as CN[11] loan money to debtors with an expectation of recovery of capital and profit, but inherent in every loan or investment is the risk of loss. The prepetition risk analysis undertaken by a creditor or investor is completely divorced from the question of whether a debtor may conduct business while in a chapter 11 case prior to confirmation. The creditor's expectation test is not designed to enable creditors to micromanage a debtor's post-filing transactions in order to ensure profitability. Rather, it is designed to protect creditors against risks of an appreciably different kind than those existing and voluntarily undertaken at the time of the loan or investment.

In this instance, the Original Agreement and Modified Agreement represent precisely what an ordinary creditor of a custom boat builder would expect its boat builder debtor to do: build and sell boats. In fact, such creditors would be justifiably concerned if, when asked to extend credit to a boat builder, they learned that the boat builder did not intend to build or sell boats, and that if it built custom boats, it intended to do so without a contract or set of plans. In addition, Mr. Enderle presented credible and uncontroverted testimony that the Purchase Price was a fair and reasonable market price; the transaction was entered into in good faith; he has fully performed his payment and other duties under the Modified Agreement; and the Debtor performed its boat building duties

---

[10] Whether the Debtor can do so profitably is an entirely different question. If all manufacturers operated profitably, there would be little need for bankruptcy protection.

[11] Whether CN is a true creditor of the Debtor or an investor is irrelevant to this analysis—it transferred money to the Debtor with the expectation of a return of either loan repayment or capital investment.

14

in the regular course of its business operations. In short, Mr. Enderle reasonably and justifiably relied on the Debtor's authorization to continue to conduct its regular business. CN provided no evidence at the hearing to the contrary, and appeared to concede that the Debtor was in the boat building business.[12] Therefore, the court finds that the execution of both the Original Agreement and the Modified Agreement were transactions in the ordinary course of the Debtor's business and were accordingly authorized and enforceable without prior notice or hearing.

Because both the Original Agreement and the Modified Agreement were executed in the ordinary course of the Debtor's business, no executory contract issue is presented. The rescission or modification does not require notice or hearing under § 363(c)(1). The net effect of the transaction and work is that the Debtor is left with no executory contract to reject or assume at the time of plan confirmation. Instead, it is bound by the Modified Agreement precisely because it was entered in the Debtor's ordinary course of its business.

### III.  Non-applicability of the Automatic Stay to the Modified Agreement—§ 362(a)

Mr. Enderle seeks relief from the automatic stay of § 362(a) because of a concern that taking possession of the Boat or taking action to title it in his name could constitute an "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). However, having concluded that the Debtor's execution of the Modified Agreement and subsequent performance in building the Boat is authorized as in its ordinary course of business pursuant to § 363(c)(1), the transfer of title of the Boat from the Debtor to Mr. Enderle is an authorized post-petition transfer that is not subject to

---

[12] Ongoing unprofitably with other factors might support conversion or dismissal of a chapter 11 case, but that issue is not currently before the court. Under these facts, the court will not find that an otherwise ordinary transaction becomes extraordinary after contract execution on the basis of a hypothetical future need to liquidate.

avoidance pursuant to § 544 or § 549(a)(1). Therefore, pursuant to § 362(b)(24), the transfer of title to the Boat is not subject to the automatic stay, and relief from stay is unnecessary.

## CONCLUSION

The Original Agreement for the sale of the Boat was executed and its performance conducted in the Debtor's ordinary course of business. The Modified Agreement also occurred in the Debtor's ordinary course of business, and accordingly was authorized and effective without necessity of notice or hearing. Accordingly, for this matter, there is no executory contract for the Debtor to reject or assume, and the automatic stay does not apply. Because the Debtor is authorized to sell the Boat in the ordinary course of its business, once all sums due it under the contract are paid, Mr. Enderle can take possession and obtain title thereto in the normal course. The Order permitting the completion of the contract and transfer of the boat remains in full force and effect.

**END OF DOCUMENT**